UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KIM MORRIS, MELISSA ADLIN, and JORGE            09-CV-1932(ALC)(MHD)
GUADRON, on behalf of themselves and all others
similarly situated,

                              Plaintiffs,         Declaration of Kim Morris

           -against-

AFFINITY HEALTH PLANS, Inc.,

                              Defendant.
-----------------------------------------------------------------X

      Pursuant to 28 U.S.C. § 1746, and under the pains and penalties of perjury, Kim Morris declares the following to be true:

1. I am the first named Plaintiff in this lawsuit and I am objecting to the proposed class action settlement for reasons I will explain in detail below. I am submitting this Declaration to alert the Court of many issues that arose during this litigation so that the Court denies the forthcoming motion to grant final approval to the proposed class action settlement because of the unfairness of the deal itself and because of the way the proposed settlement was negotiated.

2. I want to make sure that the Court is aware of the conduct of my former lawyer Troy Kessler, who I believe not only put his own, personal interests above my interests and the interests of the other plaintiffs and class members, but whose conduct was so despicable that he has caused me financial harm. I am also submitting this Declaration to request that the Court gives me permission to testify at the hearing scheduled for April 17, 2012.

3. In the event the Court sustains my objection or otherwise strikes down the proposed class action settlement, I will accept my role as a named Plaintiff and a class representative, but

with new lawyers. Since the process has now, finally, been explained to me by my new lawyers, I promise the Court that I will act in the best interests of all class members, and will not sacrifice their rights in the interests of getting a better outcome for only myself.

### My Employment at Affinity

4. I was employed at Affinity as a marketing representative from February 10, 2008 through December 24, 2008 when I was wrongfully terminated based upon false accusations of impropriety. I understand that others have explained to the Court what the duties of a marketing representative at Affinity were, and about Affinity's policies concerning the payment of overtime wages and I will not waste the Court's time in this Declaration by restating that information again.

5. The reason I stated that I was wrongfully terminated in December 2008 is because I was able to contest my termination and after an investigation by Affinity, I was vindicated and rehired in early January 2009 as a recertification specialist.

6. After my termination in December 2008 I began researching online about laws that applied to Not-For-Profit businesses in New York and stumbled upon some labor laws about unpaid overtime wages and learned that Affinity was required, but had failed, to properly compensate me for most of the overtime that I worked as a marketing representative.

7. I reviewed some of my paystubs and other documents and I calculated that I was owed approximately $25,000 from Affinity just in unpaid overtime.

8. I contacted the New York State Department of Labor to file a complaint and was told that if I hired an attorney I could get double the amount of what I was actually owed because of liquidated damages.

## My Initial Contact With, and Retention of, Troy Kessler, Esq.

9. I Googled labor law lawyers and found the website for Troy Kessler's law firm, and I contacted him in early January 2009. He and I met for a consultation, I gave him my paystubs and other documents and he more or less confirmed exactly what I was told by the Department of Labor.

10. Within a week Mr. Kessler called me back and told me based upon the documents I gave to him and what he was told by other people he had met that were contemplating suing Affinity for unpaid overtime wages, that he thought I had a good case.

11. He explained to me that my damages would have to be calculated, that I would receive what was owed to me plus additional damages and that if I wanted to move forward with the case I would have to retain his firm. He also mentioned that he would also be representing four (4) or five (5) other people in the lawsuit against Affinity.

12. There was no discussion about a class action lawsuit at that time. Mr. Kessler never mentioned to me then, or at any other time, how the class action lawsuit might affect the length of the time the case may last, my obligations as a named representative, or the recovery I might receive.

13. After I signed the retainer agreement **(Exhibit 1)** in January 2009, I went to Mr. Kessler's office four (4) or five (5) times between January and March to give him and his associate, Marijana Matura, additional documents, including a page I took from Affinity's employee handbook that explained the quota policy and how no overtime would be paid if the quota wasn't met.

14. There was no mention whatsoever that the four (4) or five (5) of us had individual claims against Affinity and if we were to be in one (1) lawsuit, there was a potential conflict of

interest among us. As a matter of fact, during the entire time that I was represented by Troy Kessler, I was never advised about the potential for a conflict of interest or asked to agree in writing that I wanted him to pursue my case despite such a conflict.

15. During the meetings between January and March, Ms. Matura told me that I would be suing Affinity along with Melissa Adlin, Helen Morris, and Jorge Guadron. Ms. Matura never mentioned, and I never asked, whether the case would be a class action or a collective action.

### The Filing of the Lawsuit and Affinity's Retaliation Against Me

16. In March 3, 2009 the lawsuit was filed and on Monday April 6, 2009 I was fired from Affinity, allegedly for being late.

17. I called Mr. Kessler that same day to tell him I was fired and he told me that Affinity was served with the lawsuit on Friday April 3, 2009.

18. A few days later I had a meeting with Mr. Kessler and Ms. Matura to see if I had a claim for retaliation against Affinity because I was fired just after the company got sued by me. Mr. Kessler said retaliation was a hard case to prove, that it was my word against theirs, and he recommended against pursuing it. He actually told me it wouldn't be worth my time. Since he was my lawyer, I took him at his word.

19. A few months later, I was still unemployed and I applied for a job as a marketing representative at a company that did pretty much the same thing as Affinity. I think the name of the company was Fidelis. As part of the application process I wrote that I had worked at Affinity as a marketing representative.

20. Fidelis called Affinity and was told that I had not been a marketing representative, so Fidelis thought I lied on my application and I did not get the job.

21. I called Ms. Matura and told her that I was retaliated against again, she told me it was unfortunate and that there was nothing that could be done about it legally.

### Mr. Kessler's Office's Calculation of My Damages

22. Since I had been unemployed for so long I started researching ways to try to get a loan and found a company called Law Capital. It was December 2009. I authorized Ms. Matura to release to Law Capital a copy of the complaint and a calculation of my damages. **(Exhibit 2).**

23. Ms. Matura provided the calculations of my damages **(Exhibit 3)**, and it was the first time I had seen them. Mr. Kessler's office calculated my damages at over $92,000. As can be seen in Ms. Matura's email, Ms. Matura stated I had to keep the calculations confidential and that I should not disclose them to anyone, including other plaintiffs in the lawsuit.

24. I never took out a loan with Law Capital.

25. Between January and December 2009 there were some emails exchanged between me and my lawyers, and we met four (4) or five (5) times. I never met with my lawyers and other plaintiffs in the lawsuit at the same time.

### Mr. Kessler's Representation of Me

26. During those meetings with my lawyers, whether it was one or both of them, I was told that Affinity hasn't settled the case and was still denying the allegations in our complaint. They also told me that I was the lead on the case and I would be able to make decisions about what we would settle the case for if, and when, we got to settlement talks.

27. I didn't really hear much about the case for a few months until Ms. Matura sent an email dated March 2, 2010 which said that the Judge had approved a motion for conditional certification that "was a **necessary** step" [emphasis in original]. **(Exhibit 4).**

28. I believed that Ms. Matura's email meant that we wouldn't have a good case unless it was pursued as a collective or a class action.

29. Several weeks later I called Ms. Matura and while we talked she told me that a collective action and a class action were the same thing and that all of us would still get compensated in full for our unpaid overtime and damages, it would not change anything and it was how the case "had" to be pursued. I believed what she, my lawyer, told me.

30. In a series of telephone calls and meetings with Ms. Matura when I questioned her about collective actions and class actions she told me that this was the way these types of cases were handled and "This is the only way the case is going to be settled."

31. Ms. Matura never told me how a class action lawsuit might affect my recovery of the unpaid overtime and damages and she even told me that I would get exactly what I was owed.

32. Mr. Kessler and Ms. Matura never asked me for my consent to file a class action, and they both told me that this is the way it had to be done.

33. Sometime in early 2011 Mr. Kessler called me to tell me that I was going to be contacted by his office in a week or so to come to his office to prepare for a deposition that Affinity wanted to take. He told me that Affinity wanted to depose me and the other "leads" on the case.

34. Mr. Kessler called me about a week later and "prepped" me over the phone for about fifteen minutes by asking me questions and giving me instructions about how I should

answer questions during the deposition. At the end of the call we scheduled a meeting for him to prep me again in his office.

35. When I went into his office to prep for the deposition Mr. Kessler asked me questions, again gave me general instructions about how to answer questions and gave me the diary and daily agenda from when I worked at Affinity which I had given him during our very first consultation in 2009. He didn't give me any other documents to review and to this day I have not seen any of the documents that Affinity has produced in this lawsuit. The prep lasted between thirty to forty five minutes.

36. Within days I was deposed, and Mr. Kessler attended the deposition with me. At the end of the deposition he told that it went well and that I did a good job. He told me that he would be in touch with me soon and the next step would be mediation when the rest of the depositions were done. I've never seen my deposition transcript and only recently learned from my new lawyers that I should have been given the transcript to review my testimony and make changes to it, if needed.

## The Mediation I Attended But Did Not Participate In

37. I assumed that Mr. Kessler would present a settlement offer at the mediation based on the calculations he had done of mine and everyone else's paystubs and other documents because it just made sense to me that would be the normal way to do it.

38. About a week or so before the mediation Mr. Kessler called me to tell me when and where the mediation was happening.

39. I never had a discussion with Mr. Kessler about how much money he was going to request at the mediation for me or anybody else, and I only learned within the past month or so that Mr. Kessler had to prepare a mediation statement.

40. During the phone call when Mr. Kessler told me about the mediation he told me that he was going to try to settle the case on a class basis, that he was going to get me the overtime and damages that I was owed, and he told me that I would decide on behalf of the class what to settle for.

41. Mr. Kessler never told me what the class damages were or what he considered to be an appropriate range for the settlement.

42. Mr. Kessler also never asked me to approve of a settlement offer he was going to make at the mediation.

43. On the day of the mediation we met at what Mr. Kessler called a "neutral" office around 9:00 a.m. I was supposed to be representing the Plaintiffs at the mediation along with Melissa Adlin and Jorge Guadron. We were introduced to the mediator and Affinity's lawyers.

44. Mr. Kessler did not show me, Melissa, or Jorge the mediation statement or any calculations he made for us or for the "class."

45. After the introductions, Mr. Kessler told me, Melissa and Jorge to sit in an empty office while he handled the mediation. The three of us sat in the office for about an hour and a half before Mr. Kessler left the mediation room, came into the office and suggested that we wait at the Panera Bread downstairs. I asked him when we would be able to go into the mediation and he said he would call us on our cell phones when he needed us. I thought that eventually I would be able to actually go into the mediation.

46. After sitting in Panera Bread for several hours Mr. Kessler came in to get something to eat, I had to stop him and ask what was going on. He said it was just a lot of back and forth, nothing was really going on and he would call us when they reached some figures that he

wanted to discuss with us. He never mentioned anything about the offers that were exchanged before the lunch break and he didn't show us any calculations at that time.

47. Around 6:30 p.m. Mr. Kessler called me, that he thought he came to an agreement we would be happy with and asked us to go upstairs to discuss it.

48. We went upstairs into the empty office and Mr. Kessler called us out of the office separately to meet with him in the waiting area between the mediation room and the office we were in. I was the first one he talked to.

49. He said "I settled the case for $2,500,000, you are getting $1,500 from the overtime and $15,000 from specialty pay" and I asked him if it was a joke. He said he thought it "was pretty good considering there were 1,500 people on the case and you're getting the most money. You should be happy." He then told me I might get extra money when the settlement was paid out if people didn't claim their funds.

50. For me, it was never about getting the most money but it was about getting paid what I was owed.

51. I asked him where the 1,500 people came from and he said "It was how the case had to be settled." He asked me what I thought would be a fair number for me and I said $50,000. He went into the mediation room to talk to Affinity's lawyers, came back and said "I can get you between $1,500 and $2,500 for overtime pay and $25,000 for the specialty pay, I think that's good and you should take it."

52. I told him I didn't understand why I wasn't getting $25,000 for the overtime and he said that I was but it was called the specialty pay.

53. I walked away and Mr. Kessler said "If you're still unsatisfied, let's just agree to the deal and I will just give you the difference out of my office." I asked him what he meant by

"out of my office" and he said "When the case is done I'll give you the remainder of what you think you are owed from what is recovered." I told him I'd think about it.

### Mr. Kessler Gets Me Two Loans and Tries Pressuring Me to Sign the Settlement Agreement

54. I had been unemployed for several months and one (1) or two (2) months after the mediation I called Mr. Kessler to ask if he would give me an advance of $8,000 against the money he promised he would pay me out of the settlement recovery from his office.

55. He told me he knew some people that would be able to give me a loan but that he didn't think I could get $8,000. He told me he thought he could get me $5,000 and then more a few weeks later.

56. A few days later I called him back to find out what was going on with the loan and he told me that he was going back and forth with the lender about the interest rates and that I wouldn't have to worry about the interest rates, he said "I will take care of the interest payments from my office."

57. Mr. Kessler called me a few days later to tell me the check was ready and that I needed to go got his office to pick it up and get the paperwork also. That day I went to his office, met with Mr. Kessler, received a $5,000 check, signed the loan papers and left the papers at his office. The loan was from Case Cash Funding, LLC ("Case Cash"). Mr. Kessler told me to wait several weeks and call him back because he would get me another loan.

58. I called him back a few weeks later, and he began the process of getting me a second loan.

59. A few days later Mr. Kessler called me to say that he received the second loan check for $5,000 and I went to his office to pick it up and sign the loan papers. Again, the loan was from Case Cash. I left the papers in his office. I wanted to confirm his promise to pay the interest and make sure it applied to the second check as well. Mr. Kessler said "You don't

have to worry about that, I'll handle it. The only thing you have to worry about is paying the $10,000 back when you get the settlement." I left his office.

60. One (1) or two (2) months later Mr. Kessler called me to say that he had received the settlement agreement and that I had to go to his office to sign it. He said "I think you'll be happy with it." He told me the amount I was going to receive, so I told him I was not going to come in and sign the settlement because I was not happy and wanted the $50,000. He asked me to give him some time to see what he could do.

61. A couple of days later he called and told me that his accountant found more money for me, that he could get me an additional $1,500. I told him it still didn't get me to $50,000 so he said give him some more time to see what he could do.

62. A day or two (2) later Mr. Kessler called me back to tell me $50,000 and asked me to sign the settlement.

63. On July 19, 2011 Mr. Kessler brought the agreement to the recreation room of my apartment complex. The agreement said I would get $45,000 for "specialty" pay, and I was told by Mr. Kessler that the specialty payment, plus the overtime pay and any unclaimed funds, I would get my $50,000. I asked him to give me a copy of the settlement to read and review, but he refused. He told me "you wouldn't understand it because it's in legal terms" and told me he couldn't leave it with me because it was confidential and the Judge wouldn't approve of him leaving it with me.

64. He offered to read the "important parts" of the agreement to me but I told him "No thanks, I'd rather read the whole thing myself." He said "You know what, forget it, I see that you're going to give me a problem already. I have important things to do with my family."

He snatched the papers out of my hands, told me to call him the following Monday, and left.

65. I called Mr. Kessler's office every day and left several messages, but he didn't return my calls so on August 9, 2011 I contacted Ms. Matura, and Mr. Kessler's partner at the law firm, Steve Shulman.

66. Finally Mr. Shulman called me back and we discussed the promises Mr. Kessler made to me about taking care of the interest payments on the loans and any shortfall between what I wanted in the settlement and what I actually received, out of the settlement recovery obtained by his office.

67. Mr. Shulman told me that Mr. Kessler misrepresented their office's policies, and that none of my verbal agreements with Mr. Kessler would be possible. Mr. Shulman also told me that Mr. Kessler misrepresented to me that the Court wouldn't approve of me having the settlement agreement to review and that it was actually Affinity that didn't want me to have it.

68. On Friday August 11, 2011, Mr. Shulman arrived at my home with a Confidentiality Agreement **(Exhibit 5)** for me to sign as between me and his law firm and told me that because of my lack of communication they were pressed for time and I had to sign it by the following Monday.

69. While we met, Mr. Shulman kept pressuring me to sign the settlement agreement by telling me that you never know what could happen in the case, that Affinity could go bankrupt. He also told me that I should get it while I can. I would not sign the settlement agreement or the confidentiality agreement.

70. Finally, Mr. Shulman said "forget it, you don't have to sign it if you don't want to" and he left with the documents.

71. On Friday March 2, 2012 I had a telephone conference with Jimstael ("Jim") Alouidor from Case Cash. During that call Jim told me that Case Cash's notes on my file stated that Mr. Kessler told them I was going to receive $70,000 from the settlement and that I would receive it in three (3) months. Jim also said that Mr. Kessler had worked with Case Cash in the past.

72. I now think that Mr. Kessler had been all too eager to get me the loans from Case Cash because the interest payments would force me, in the end, to sign the proposed class action settlement under duress.

## The Position I Am In Now

73. Now, I am stuck in a very bad financial situation. I have decided to object to the proposed class action settlement instead of opting out of it because I need to repay the loans that were obtained for me by Mr. Kessler and that will cost about $14,000 in principle and interest. I can' t afford to allow the interest payments to continue to accumulate.

74. If my objection to the proposed class action settlement is overruled by this Court, I request that what is now considered my service fee under the terms of the proposed class action settlement be deemed by the Court to be payment from Affinity for my unpaid overtime.

75. As the Court will notice, under the proposed class settlement, I stand to receive $1,655.98 in damages, which is less than 2% of what Mr. Kessler calculated my damages to be, in addition to the "service award." I should receive the $30,000 "service award" as wages or statutory penalties, as the service award is nothing more than a bribe for me to sign the proposed class action settlement.

76. In a Declaration dated August 19, 2011, Mr. Kessler states that the proposed settlement, "represents a significant percentage of the recovery that plaintiffs would have achieved had they prevailed on all of their claims and survived an appeal." Since Mr. Kessler never showed me any calculations for what the "class" was owed, and never discussed with me what he thought would be an appropriate range of money for the class, I doubt very much that Mr. Kessler can state what percentage of recovery the class is actually receiving under the proposed settlement he negotiated but I am certain he could tell everyone what his expected legal fee would be.

77. In the event that this Court sustains my objection to the proposed class action settlement and denies final approval of it, I request that Mr. Kessler, and his firm, be removed as class counsel.

Dated: Commack, New York
March 7, 2012

_____
Kim Morris